**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS TRUSTEE FOR THE
REGISTERED HOLDERS OF LSTAR
COMMERCIAL MORTGAGE TRUST
2017-5, COMMERCIAL MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES
2017-5,

                Plaintiff,

                v.

YECHIEL RIVLIN,

                Defendant.

---

Civil Action No. 24-5789 (MAS) (RLS)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

       This matter comes before the Court on Plaintiff Wilmington Trust, National Association, as Trustee for the Registered Holders of LSTAR Commercial Mortgage Trust 2017-5, Commercial Mortgage Pass-Through Certificates, Series 2017-5's ("Plaintiff") Amended Motion for Summary Judgment (ECF No. 26) and Defendant Yechiel Rivlin's ("Defendant") Cross Motion to Dismiss (ECF No. 38) Plaintiff's Amended Complaint (ECF No. 11). Defendant opposed Plaintiff's Motion for Summary Judgment (ECF Nos. 37, 38)[1] and Plaintiff replied (ECF No. 63). Plaintiff opposed Defendant's Cross Motion to Dismiss (ECF No. 51), and Defendant replied (ECF No. 64). The Court has carefully considered the parties' submissions and decides the matter without oral

---

[1] Defendant filed the same Memorandum of Law twice: once in opposition to Plaintiff's Motion for Summary Judgment (ECF No. 37); and second in Support of Defendant's Cross-Motion to Dismiss (ECF No. 38). For the purposes of this Memorandum Opinion, the Court considers ECF No. 38 as the operative Memorandum of Law for both.

argument pursuant to Local Civil Rule 78.1. For the reasons stated below, the Court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Cross Motion to Dismiss.

## I.    BACKGROUND

### A.    Factual Background

#### 1.    *The Trust Structure*

Plaintiff is Trustee for the Registered Holders of LSTAR Commercial Mortgage Trust 2017-5, Commercial Mortgage Pass-Through Certificates, Series 2017-5 (the "Trust"). (*See* Statement of Facts ("SOF") 1, ECF No. 24; Defendant's Response to Plaintiff's Statement of Facts ("DSOF") 1, ECF No. 37-3.) The Trust is a commercial mortgage-backed securities ("CMBS") trust which "is a financial structure that pools together numerous commercial mortgage loans and then issues bonds (securities) backed by the payments from those loans. Commercial banks and other lenders originate loans for various commercial properties, such as office buildings, retail spaces, hotels, apartments, and industrial facilities." (Laura P. Sims Second Decl. ("Sims Second Decl.") ¶ 4, ECF No. 50.) CMBS loans are typically "'non-recourse,' meaning the lender's recourse in case of default is limited to the collateral . . . with no personal liability for the borrower, except in cases of . . . specific 'bad boy' acts[.]" (*Id.* ¶ 5.) Lenders generally sell these loans to an issuer rather than keeping them on their balance sheets. (*Id.* ¶ 6.) Thereafter, "[t]he issuer then bundles a diverse collection of these commercial mortgage loans into a portfolio. This portfolio of loans is then placed into a legal entity, which is the CMBS trust." (*Id.*) These trusts are "typically structured as a Real Estate Mortgage Investment Conduit (REMIC), which is a tax-advantaged entity that allows the income to 'pass through' to investors without being taxed at the trust level." (*Id.*) Once the loans are in the trust, "the trust issues various classes of certificates, known as 'tranches,' to investors. These tranches have different levels of risk and corresponding returns."

(*Id.* ¶ 7.) "The principal and interest payments from the commercial property owners on their mortgage loans flow into the CMBS trust. The trust then distributes these payments to the certificateholders (investors) according to the seniority of their tranches." (*Id.* ¶ 9.)

The Loan at issue here is one of twenty-nine commercial mortgage loans that were originally pooled and securitized pursuant to the Pooling Service Agreement ("PSA") dated March 1, 2017. (*Id.* ¶ 15; *see generally* Ex. A to Sims Second Decl., ECF No. 50-1.) The March 2017 PSA was amended on November 30, 2018. (Sims Second Decl. ¶ 15; Ex. B to Sims Second Decl. (the "PSA"), ECF No. 50-2.) The PSA sets forth that "[i]t is the intention of the parties hereto that a common law trust be established under the laws of the State of New York pursuant to this Agreement," and that "[t]his Agreement is not intended to create a partnership or a joint-stock association between or among any of the parties hereto." (PSA 88-89; Ex. A to Sims Second Decl. at 93.)

### 2.    *Loan to Whitehorse and Guaranty by Defendant*

On January 26, 2017, LSTAR Capital Finance II (the "Original Lender") issued a loan (the "Loan Agreement") in the principal amount of $12.95 million to Whitehorse 401 LLC ("Whitehorse"). (SOF ¶ 1; DSOF ¶ 1; *see generally* Ex. A to Laura P. Sims Decl. ("Sims Decl.") (the "Loan Agreement"), ECF No. 22-1.) In connection with the Loan Agreement, Whitehorse executed a Promissory Note (the "Note"), reiterating its obligations under the Loan Agreement. (SOF ¶ 5; DSOF ¶ 5; Ex. B to Sims Decl. (the "Note"), ECF No. 22-2.) Whitehorse used the loan to purchase property located at 401 Whitehorse Road, Voorhees Township, New Jersey 08043 (the "Property") which was secured by a mortgage (the "Mortgage"). (*See* SOF ¶ 6; DSOF ¶ 6; Sims Decl. ¶ 6, ECF No. 22; 341 Meeting 10:23-12:15, ECF No. 22-19.) The

Loan Agreement required, among other things, Whitehorse to make monthly payments and furnish certain financial reporting documents. (Loan Agreement 10, §§ 2.2.1, 5.1.10.)

Also on January 26, 2017, Defendant, the majority member and majority owner of Whitehorse, executed and delivered to the Original Lender a guaranty (the "Guaranty"). (SOF ¶ 7; DSOF ¶ 7; 341 Meeting 9:5-11:5; *see generally* Ex. C to Sims Decl. (the "Guaranty"), ECF No. 22-3.) The Guaranty provides that the "term 'Guaranteed Recourse Obligations of [Whitehorse]' as used in this Guaranty shall mean all obligations and liabilities of [Whitehorse] for which [Whitehorse] shall be personally liable pursuant to the Note, the Loan Agreement, or the other Loan Documents," and that Whitehorse, and through the Guaranty, Defendant, becomes personally liable if certain triggering events occur. (Guaranty 1.) The Guaranty provides that Defendant "absolutely and unconditionally guarantees to [Original] Lender the prompt and unconditional payment of the Guaranteed Recourse Obligations of [Whitehorse.]" (*Id.*) The Loan Agreement provides that Whitehorse becomes liable if Whitehorse defaults under the Section 5.1.10 reporting requirements (the "Mandatory Reporting Defaults") of the Loan Agreement beyond the thirty-day notice period from Plaintiff. (Loan Agreement § 5.1.10.) With respect to Mandatory Reporting Defaults or any bankruptcy proceeding that includes the Property or any part thereof as an asset (a "Property Bankruptcy Default"), the Loan Agreement provides, in relevant part:

> Notwithstanding the foregoing, the agreement of [Original] Lender not to pursue recourse liability as set forth in Subsection (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect and the Loan shall become fully recourse to [Whitehorse] and [Defendant], jointly and severally (i) . . . (B) in the event of [Whitehorse]'s default under Section 5.1.10 beyond thirty (30) days['] notice from [Original] Lender, (ii) if the Property or any part thereof shall become an asset in a voluntary bankruptcy or insolvency proceeding[.]

(*Id.* § 9.4(c).)

### 3.    *Transfers of the Loan Documents*

On February 1, 2017, Original Lender assigned and transferred the Loan Agreement, Note, and Guaranty (collectively, the "Loan Documents") to LSTAR I, LLC ("LSTAR I"), and executed and delivered an allonge dated the same. (SOF[2] ¶¶ 12-13; *see generally* Ex. D to Am. Compl., ECF No. 11-4; Ex. A to Sims Supp. Decl., ECF No. 27-1.) That same day, Original Lender, through a separate assignment, assigned and transferred the mortgage, leases, and rents on the Property to LSTAR I. (Ex. J to Sims Decl. at Ex. I, ECF No. 22-10.) On March 31, 2017, LSTAR I assigned and transferred the Loan Documents back to Original Lender and executed and delivered an allonge dated the same. (SOF ¶¶ 14-15; *see generally* Ex. B to Sims Supp. Decl., ECF No. 27-2; Ex. E to Am. Compl., ECF No. 11-5.) That same day, LSTAR I assigned and transferred the mortgage, leases, and rents back to Original Lender. (Ex. J to Sims Decl. at Ex. K.) Also, that same day, Original Lender assigned and transferred the Loan Documents to Plaintiff and executed

---

[2] The Court occasionally cites Plaintiff's SOF as background without citing Defendant's DSOF, and notes that while Defendant claims to have a "basis to dispute" the validity of the allonges and assignments, it is not meaningful or material based on, as discussed in detail below, the State Court and Bankruptcy proceedings, and the fact that Defendant does not dispute the authenticity of, among other things, the Guaranty. (*See, e.g.*, SOF ¶¶ 26-28, 38, 40, 43; DSOF ¶¶ 26-28, 38, 40, 43; *see generally* Ex. Q to Sims Decl. (the 'Goldwasser Decl.'), ECF No. 22-17.) The Court, additionally, cites to documents in the record when citing Plaintiff's SOF alone.

and delivered an allonge dated the same. (SOF ¶¶ 16-17; *see generally* Ex. C to Sims Supp. Decl., ECF No. 27-3; Ex. F to Am. Compl., ECF No. 11-6; *see also* Goldwasser Decl. ¶ 12 ("the LSTAR Loan which had been assigned to [Plaintiff], as a trustee of the REMIC trust").) Original Lender also assigned and transferred the mortgage, leases, and rents to Plaintiff that day. (Ex. J to Sims Decl. at Ex. M.)

### 4.      *Default and State Court Proceedings*

On March 6, 2023, Whitehorse failed to make the required monthly payment. (SOF ¶ 19; Ex. G to Sims Decl., ECF No. 22-7; Goldwasser Decl. ¶ 13.) On March 15, 2023, Plaintiff declared the loan in default and issued a notice addressed to Whitehorse, with attention to Defendant, advising of the default and demanding immediate payment. (SOF ¶ 20; Ex. G. to Sims Decl.; Goldwasser Decl. ¶ 13.) Whitehorse then failed to make the required monthly payments for April and May 2023, and to provide the documentation required under Section 5.1.10(b) of the Loan Agreement. (SOF ¶ 21; Goldwasser Decl. ¶ 13; Ex. H to Sims Decl. 1, ECF No. 22-8.) On May 19, 2023, Plaintiff sent a second notice addressed to both Whitehorse and Defendant, advising of the continued default and accelerating the sums due under the Loan Documents. (SOF ¶ 22; *see generally* Ex. H to Sims Decl.) The second notice further stated that Whitehorse's failure to make monthly payments was not an "exhaustive" list of defaults, and that Whitehorse had also failed to produce the required documentation under Section 5.1.10 of the Loan Agreement since March of 2023. (Ex. H to Sims Decl. 1.) Whitehorse made no payment thereafter, and on June 20, 2023, Plaintiff sent Whitehorse and Defendant a third notice, demanding immediate payment and further expounding on Whitehorse's and Defendant's failure to comply with the reporting requirements under Section 5.1.10 of the Loan Agreement. (SOF ¶ 23; *see generally* Ex. I to Sims Decl., ECF No. 22-9.)

Plaintiff filed a complaint in foreclosure on July 14, 2023, in the Superior Court of New Jersey, Chancery Division (the "State Court Action") against Whitehorse. (SOF ¶ 26; DSOF ¶ 26; Ex. J to Sims Decl. *2-17.)[3] On December 3, 2024, after Whitehorse filed an untimely Answer to Plaintiff's state court complaint, the court in the State Court Action entered a final judgment in foreclosure and sale (the "State Court Judgment") and subsequently issued a Writ of Execution. (SOF ¶¶ 27-28; DSOF ¶¶ 27-28; Ex. K to Sims Decl., ECF No. 22-11; Ex. L to Sims Decl., ECF No. 22-12.)

### 5.    *The Bankruptcy Cases*

On or about June 11, 2024, Whitehorse filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "First Bankruptcy Case"). (SOF ¶ 30; DSOF ¶ 30; Ex. M to Sims Decl; Goldwasser Decl. ¶ 14.) The Property was listed on Whitehorse's Schedule of Assets. (SOF ¶ 31; DOF ¶ 31.) Plaintiff filed a Motion for Entry of an Order Dismissing Whitehorse's Chapter 11 Case or, Alternatively, Granting Relief from the Automatic Stay (the "First Bankruptcy Dismissal Motion"), on July 9, 2024. (SOF ¶ 33; DSOF ¶ 33.) It sought: (1) dismissal of the First Bankruptcy Case as both a bad faith filing and as having been filed without corporate authority; or (2) alternatively, an order lifting the automatic stay to allow Plaintiff to move forward in the State Court Action. (SOF ¶ 33; DSOF ¶ 33.) On September 26, 2024, the U.S. Trustee filed a Motion to Dismiss the Chapter 11 Case (the "UST Dismissal Motion"), seeking dismissal of the First Bankruptcy Case as filed without proper authorization. (SOF ¶ 34; DSOF ¶ 34.) The Bankruptcy Court entered an Order Dismissing the Chapter 11 Case on November 13, 2024.

---

[3] Page numbers preceded by an asterisk refer to the page numbers atop the ECF header.

(SOF ¶ 35; DSOF ¶ 35.) Whitehorse filed its second voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the Eastern District of New York on February 25, 2025 (the "Second Bankruptcy Case"). (SOF ¶ 36; DSOF ¶ 36.) The Second Bankruptcy Case is still pending.

In connection with the Second Bankruptcy Case, Whitehorse filed its Schedules, Statements and Affidavit Pursuant to Eastern District of New York Local Bankruptcy Rule 1007-1(b) and verified that the filed schedules were true and correct under penalty of perjury. (SOF ¶ 38; DSOF ¶ 38.) This filing included the following schedules: (1) Schedule A/B Assets – Real and Personal Property; (2) Schedule D – Creditors Who Have Claims Secured by Property; (3) Schedule E/F – Creditors Who Have Unsecured Claims; (4) Schedule G – Executory Contracts and Unexpired Leases; (5) Schedule H – Codebtors; (6) a Summary of Assets and Liabilities for Non-Individuals Declaration; and (7) a List of Creditors Who Have the Largest 20 Unsecured Claims. (SOF ¶ 38; DOF ¶ 38.) Schedule D initially listed Plaintiff as the creditor of an undisputed secured claim due to the Mortgage in the amount of $14,000,000. (SOF ¶¶ 40-41; DSOF ¶¶ 40-41; Ex. P to Sims Decl. at Schedule D, ECF No. 22-16.) In addition, in connection with the Second Bankruptcy, David Goldwasser ("Goldwasser"), Vice-President of Restructuring for Whitehorse, wrote in his declaration to the Bankruptcy Court that: (1) the Property is Whitehorse's sole asset; (2) Whitehorse borrowed $12,950,000 from Original Lender to purchase the Property; (3) Whitehorse defaulted on the Loan; (4) the Loan had been assigned to Plaintiff; (5) Plaintiff called a default in March 2023 as a result of Whitehorse's missed March 2023 payment; (6) Plaintiff advised Whitehorse of prior and continuing defaults and accelerated the Loan by correspondence dated May 19, 2023; and (7) Plaintiff is "owed in excess of $14 million inclusive of default interest and related fees on account of the [] Loan." (Goldwasser

Decl. ¶¶ 10-13, 19.) Attached to the Goldwasser Declaration, signed under penalty of perjury, is a list of creditors holding the five largest secured claims. (Ex. B. to Goldwasser Decl.) The only named creditor listed is Plaintiff, as holding a $14,000,000 Mortgage. (*See id.*)

On March 19, 2025, Goldwasser executed a Debtor's Disclosure Statement to Accompany the Plan of Reorganization on behalf of Whitehorse (the "Disclosure Statement"). (SOF ¶ 44; DSOF ¶ 44; *see generally* Ex. R to Sims Decl. (the "Disclosure Statement"), ECF No. 22-18.) Section III (A) of the Disclosure Statement states that Whitehorse defaulted under the Loan Documents for "fail[ing] to pay the March 2023 loan payment" and acknowledges that Whitehorse received the default notices. (Disclosure Statement 9-10.) On April 7, 2025, a trial attorney with the Office of the United States Trustee conducted a meeting of creditors under Section 341 of the Bankruptcy Code (the "341 Meeting"). (*See generally* 341 Meeting.) During the 341 Meeting, the attorney swore in Defendant and Goldwasser and took testimony from them. (341 Meeting 4:16-5:16.) Goldwasser affirmed that he had signed the Schedules, and both Defendant and Goldwasser affirmed that the information contained within them was true and accurate. (341 Meeting 6:14-7:19.) Thereafter, on June 23, 2025, Goldwasser submitted a new Schedule D indicating that Plaintiff's claim against Whitehorse is now disputed. (Ex. A to Def.'s Cross Mot. to Dismiss, ECF No. 38-2.)

### B.    Procedural Background

On May 1, 2024, Plaintiff initiated this action against Defendant, asserting two claims: (1) breach of guaranty (Count I); and (2) unjust enrichment (Count II). (*See generally* Compl., ECF No. 1.)

After Whitehorse filed for the First Bankruptcy, Plaintiff filed an Amended Complaint reasserting its breach of guaranty and unjust enrichment claims and further alleging that

Whitehorse's Bankruptcy Petition constitutes an Event of Default under Section 8.1(a)(vii) of the Loan Agreement pursuant to which Plaintiff may pursue full recourse liability against Defendant. (Am. Compl. ¶¶ 30-31, 37-43, ECF No. 11.) Defendant filed a Motion to Dismiss the Amended Complaint. (Mot. to Dismiss, ECF No. 12.) This Court granted in part and denied in part Defendant's Motion, dismissing Plaintiff's unjust enrichment claim. (Order, ECF No. 16.) Defendant, thereafter, filed an Answer. (Answer, ECF No. 17.) Plaintiff filed a Motion for Summary Judgment in April of 2025 (Mot. for Summary J., ECF No. 21) and then filed the instant Amended Motion for Summary Judgment (Am. Mot. for Summary J., ECF No. 26). Defendant filed a Cross Motion to Dismiss the Amended Complaint and Opposition to Plaintiff's Motion for Summary Judgment. (Def.'s Opp'n Br., ECF Nos. 37, 38.) Plaintiff replied. (Pl.'s Reply Br., ECF No. 63.) Plaintiff opposed Defendant's Cross Motion to Dismiss (Pl.'s Opp'n Br., ECF No. 51), and Defendant replied (Def.'s Reply, ECF No. 64).

## II.     LEGAL STANDARD

### A.     Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)[4]

Federal courts are courts of limited jurisdiction, meaning that for a federal court to hear a case, it must have jurisdiction over the issue, such as diversity or federal question jurisdiction. *Mack v. Six Flags Great Adventure, LLC*, No. 23-3813, 2024 WL 69879, at *2 (D.N.J. Jan. 5, 2024). To satisfy the jurisdictional requirements of federal question jurisdiction, a plaintiff must assert a claim that "aris[es] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. To satisfy the jurisdictional requirements of diversity jurisdiction, no plaintiff can be a citizen of the same state as any defendant, and the amount in controversy must exceed

---

[4] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

$75,000. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990); *Schneller ex rel. Schneller v. Crozer Chester Med. Ctr.*, 387 F. App'x 289, 292 (3d Cir. 2010). Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a matter for lack of subject matter jurisdiction. *Wongus v. Corr. Emergency Response Team*, 389 F. Supp. 3d 294, 298 (E.D. Pa. 2019). "[I]t is the plaintiff who bears the burden of proving that the federal court has jurisdiction." *McCracken v. Murphy*, 129 F. App'x 701, 702 (3d Cir. 2005) (citations omitted); *see also Wright v. N.J./Dep't of Educ.*, 115 F. Supp. 3d 490, 495 (D.N.J. 2015) ("It is well-settled that the plaintiff bears the burden of establishing subject[-]matter jurisdiction in order to defeat a motion under Rule 12(b)(1)."). In considering dismissal for lack of subject-matter jurisdiction, a district court's focus is not on whether the factual allegations entitle a plaintiff to relief but rather on whether the court has jurisdiction to hear the claim and grant relief. *Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 445 (D.N.J. 2002) (citing *New Hope Books, Inc. v. Farmer*, 82 F. Supp. 2d 321, 324 (D.N.J. 2000)).

"A district court has to first determine, however, whether a Rule 12(b)(1) motion presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (citations omitted). Under a facial attack, the movant challenges the legal sufficiency of the claim, and the court considers only "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("The facial attack does offer similar safeguards to the plaintiff [as a Rule 12(b)(6) motion]: the court must consider the allegations of the complaint as true."). The Court, under a facial attack, "may dismiss the complaint only if it appears to a certainty that

the plaintiff will not be able to assert a colorable claim of subject[-]matter jurisdiction." *D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 491 (D.N.J. 2008) (citations omitted). Under a factual attack, however, the challenge is to the trial court's "very power to hear the case." *Mortensen*, 549 F.2d at 891. Thus, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* Moreover, in a factual attack, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs.*, 220 F.3d at 178.

### B.    Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present

actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

III.    **DISCUSSION**

Plaintiff makes one argument in support of its motion for summary judgment; namely, that Defendant is liable under the Guaranty for the full indebtedness owed to Plaintiff. (Pl.'s Moving Br. 10-13, ECF No. 23.) Plaintiff contends that there are no genuine issues of material fact because Defendant has admitted the material facts needed to enter judgment. (*Id.* at 11.) Plaintiff also argues that the Court should strike Defendant's affirmative defenses. (*Id.* at 14-19.)

Defendant argues that this Court should deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross Motion to Dismiss because: (1) this Court lacks subject matter jurisdiction because Plaintiff is a "business trust" and as a result the pleadings and evidence do not support diversity jurisdiction; and (2) there are genuine disputes of material fact. (*See* Def.'s Opp'n Br. 10-29.)

The Court first addresses Defendant's Motion to Dismiss because Defendant challenges this Court's jurisdiction over the issue, which is a threshold matter.

### A.    Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant argues that Plaintiff's Complaint should be dismissed because this Court lacks subject matter jurisdiction. (*See id.* at 10-18.) Defendant raises both a facial and factual attack to this Court's subject matter jurisdiction. (*Id.* at 11.) Defendant contends that, facially, the Amended Complaint fails to set forth a sufficient basis for jurisdiction because it fails to plead the citizenship of the beneficiaries of the Trust, which is required pursuant to *Americold Realty*, because Plaintiff is a "business trust." (*Id.* at 11-13 (citing *Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 382 (2016)).) Defendant asserts that, factually, the Amended Complaint fails because it is "overwhelmingly likely" that some of the beneficiaries of the Trust are domiciliates of New Jersey, which he also is. (*Id.* at 11-12.) Defendant further argues that when the factors to determine whether a trust is a business trust articulated by the Third Circuit in *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29 (3d Cir. 2018) are applied, the evidence suggests that the Trust is a business trust because: (1) the trust is not a "donative" trust, but a business investment vehicle, specifically, a REMIC; (2) the Trustee is a Delaware entity, and "it is reasonable to assume that the Trust is a Delaware statutory trust" and "Delaware law specifically recognizes that REMICs may qualify as a Delaware statutory trust"; and (3) federal courts have recognized that Delaware

statutory trusts are juridical persons. (*Id.* at 14-16.) In the alternative, Defendant argues that if the Court does not dismiss Plaintiff's Amended Complaint, it should deny Plaintiff's Motion for Summary Judgment and order jurisdictional discovery to determine the nature of the Trust and the citizenship of its beneficiaries. (*Id.* at 17-18.)

Plaintiff responds that no discovery is required, and the indisputable facts prove that this Court has subject matter jurisdiction because it is a citizen of Delaware, and Defendant is a citizen of New Jersey. (Pl.'s Reply. Br. 8; Pl.'s Opp'n Br. 2-12.) Plaintiff contends that because the Trustee is the named plaintiff of an active trust, the Trustee's citizenship is determinative because the named trustee is a real and substantial party to the controversy. (Pl.'s Opp'n Br. 4.) It submits that the Trust is a CMBS/REMIC trust that is managed, administered, and controlled by Plaintiff pursuant to the PSA which shows that Plaintiff is an active trustee. (*Id.* at 5-6.) Plaintiff argues that Defendant's reliance on *Americold* is misplaced because, in that case, the Supreme Court considered whose citizenship mattered in determining diversity jurisdiction when a trust was sued under its own name and not that of its trustee, and that its trustee was not a party to that case. (*Id.* at 9-10.) Plaintiff further maintains that Defendant's reliance on *GBForefront*, is equally misplaced because Plaintiff is an active trustee, sued in its own name, the type of trust here is different from the type of trust in that case, and the Trust is not a Delaware statutory trust, but a common law trust organized under the laws of the State of New York. (Pl.'s Opp'n Br. 11-12.)

For purposes of diversity jurisdiction, "when [a] trustee[] initiate[s] a lawsuit in their own name or [is] the target of a suit, courts consider only the citizenship of the trustee[] for purposes of determining diversity jurisdiction." *GBForefront*, 888 F.3d at 37 (citing *Navarro Sav. Ass'n v. Lee*, 466 U.S. 458, 465-66 (1980)); *see also Americold Realty*, 577 U.S. at 382 (explaining that "when a trustee files a lawsuit in *her* name, her jurisdictional citizenship is the State to which she

15

belongs" (emphasis in original)). The named trustee must also "be [a] real and substantial part[y] to the controversy." *Navarro*, 446 U.S. at 460 (citation omitted). A trustee qualifies as a "real party to the controversy" when the trustee "possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." *Id.* at 464.

When the trust itself is a named party to a suit, conversely, citizenship for diversity purposes turns on whether the trust is a traditional trust—where only the trustee's citizenship is considered—or a business trust—where the trustee and the beneficiaries' citizenship is considered. *See GBForefront*, 888 F.3d at 39 (explaining that for diversity purposes, "the citizenship of a traditional trust is only that of its trustee, while that of a business entity called a trust is that of its constituent owners"). A traditional trust "embod[ies] a fiduciary relationship," while a business trust, though "bear[ing] the 'trust' name, [is an] unincorporated business entit[y]." *Id.* at 40. Here, however, the analysis is simple. Plaintiff brings the instant action in its own name as Trustee of a New York common law trust which is a traditional trust. (*See* PSA at § 2.01(a); *see generally* Am. Compl.); *see, e.g.*, *Wilmington Tr., Nat'l Ass'n v. Aevri Salina Meadows LLC*, No. 23-8824, 2025 WL 405721, at *5 (S.D.N.Y. Feb. 5, 2025) (noting that under New York law a common law trust is not a juridical person and cannot sue or be sued in its own name); *see also Anh Nguyet Tran v. Bank of N.Y.*, No. 13-580, 2014 WL 1225575, at *1 n.4 (S.D.N.Y. Mar. 24, 2014) ("[U]nder New York law, a trust is not a person that can sue or be sued, and litigation involving a trust must be brought by or against the trustee in its capacity as such."), *aff'd*, 610 F. App'x 82 (2d Cir. 2015); *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 731-32 (2d Cir. 2017) (holding that, because the party trusts "ha[d] no distinct juridical identity allowing them to sue or to be sued in their own names[,]" the "pleadings in the names of the trusts themselves d[id] not require that

th[ose] parties' citizenship, for purposes of diversity, be determined by reference to all their members," but instead by the citizenship "of their respective trustees").[5]

Plaintiff, moreover, qualifies as a real party to the controversy because it has the powers to hold, manage, and dispose of assets for the benefit of others under the PSA.[6] *See, e.g.*, *WBCMT 2007-C33 NY Living, LLC v. 1145 Clay Ave. Owner, LLC*, 964 F. Supp. 2d 265, 270 (S.D.N.Y. 2013) ("[The trustee] has all right, title and interest in the loan documents. That makes it a real and substantial party[.]"); *Wells Fargo Bank, Nat'l Ass'n as Tr. for Benefit of Holders of Comm. 2015-LC19 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 5615 N. LLC*, No. 20-2048, 2022 WL 15523689, at *5 (S.D.N.Y. Oct. 27, 2022) (explaining that "[e]ven where a special servicer or master servicer is 'charged with duties to manage the Trust,' . . . a trustee[ still has the] power to hold, manage, and dispose of assets where the special servicer or master servicer's 'power . . . flows from the Trustee'" (citation omitted)); *Wells Fargo Bank, N.A. v. CCC Atl., LLC*,

---

[5] Defendant argues that the Court should look to *North Hills Village LLC v. LNR Partners, LLC*, 479 F. Supp. 3d 189 (W.D. Pa. 2020), where the court determined the trust at issue was a "business" trust. (Def.'s Reply 12-13.) The trustee in that case, however, was not suing in its own name which was the reason the court conducted an analysis of whether the trust was a business trust or traditional trust. *North Hills Village*, 479 F. Supp. 3d at 193-94. *North Hills* is therefore distinguishable and not applicable here.

[6] Plaintiff has the powers to hold, manage, and dispose of assets for the benefit of others under the PSA. (*See, e.g.*, Sims Second Decl. ¶ 17 (noting that Plaintiff was appointed "to act, as Trustee . . . to hold the Trust Fund . . . in the trust for the exclusive use and benefit of all present and future" trust beneficiaries); PSA § 2.01(a) (providing that Plaintiff is appointed Trustee to hold the Trust Fund in trust for the benefit of the Certificateholders); PSA § 2.01(b) (providing that Plaintiff is the holder of "all the rights, title and interest" in all Mortgage Loans in the Trust and all principal and interest and proceeds of the Mortgage Loans); PSA § 3.01(a) (providing that "the Master Servicer and Special Servicer shall service and administer the applicable Serviced Mortgaged Loans, the applicable Serviced Companion Loans and any applicable Administered REO Properties . . . *on behalf of the Trustee*" (emphasis added)); PSA § 3.04(b) (providing that the Certificate Administrator shall hold all funds collected and received in connection with the servicing of the Mortgage Loans in a segregated account "to be held on behalf and in the name of [Plaintiff] in trust for the benefit of the Certificateholders").

905 F. Supp. 2d 604, 611-13 (D.N.J. 2012) (finding that the citizenship of the trustee of a CMBS/REMIC trust governed by a PSA was determinative because the trustee was an "active trustee"); *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 410 (S.D.N.Y. 2016) (concluding "that the Trustee is [a] real and substantial party to the controversy"); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 607 (S.D.N.Y. 2012) (noting that "Courts . . . have held that PSAs containing language virtually identical to the PSA at issue here allowed the trustees in those cases to bring suit in their own right").[7]

Plaintiff is therefore a "real and substantial part[y] to the controversy" and the Court looks to Plaintiff's citizenship, and not that of the Trust's beneficiaries, to determine whether it has diversity jurisdiction. *Navarro*, 446 U.S. at 460 (citation omitted); *GBForefront*, 888 F.3d at 37. Plaintiff is a citizen of Delaware because it "is a national banking association with its designated main office located in Wilmington, Delaware." (Am. Compl. ¶ 1); *Blount v. TD Bank, N.A.*, No. 20-18805, 2023 WL 4621881, at *5 n.4 (D.N.J. July 19, 2023) (explaining that a "national bank is a citizen of the state in which its main office . . . is located" (quoting *Zarour v. JPMorgan Chase Bank, N.A.*, No 14-6261, 2017 WL 684463, at *3 (D.N.J. Feb. 21, 2017))), *reconsideration denied*, No. 20-18805, 2023 WL 7403603 (D.N.J. Nov. 9, 2023); *see also Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) (same); *Spano v. JPMorgan Chase Bank, NA*, 521 F. App'x 66,

---

[7] Defendant argues that, with respect to "Specially Serviced Mortgage Loans," the Certificateholders, not the Trustee, control the loan because the Directing Certificateholder may object to the Asset Status Report ("ASR") and has certain approval rights pertaining to the ASR. (Def.'s Reply 3-10.) The Special Servicer, however, has the final say pursuant to the PSA, and the fact that the Directing Certificateholder may object to and approve certain actions of the Special Servicer, does not render the Trustee, as acting through the Special Servicer, a non-active trustee. (*See, e.g.*, PSA § 3.24 (a) (providing that the Directing Certificateholder may object to the ASR, but that "the Special Servicer shall implement the recommended action as outlined in the [ASR] if it . . . determin[es] . . . that the objection is not in the best interest of all the Certificateholders"); PSA § 3.24 (c) (providing that the Special Servicer may undertake a Material Action if it determines that immediate action is necessary).)

69 n.2 (3d Cir. 2013) (same). The parties, accordingly, are diverse. (*See* Am. Compl. ¶¶ 1, 5 (pleading that Plaintiff "is a national banking association with its designated main office located in Wilmington, Delaware[,]" and Defendant "is an individual residing" in "Lakewood, New Jersey").) The amount in controversy, moreover, is greater than $75,000. (*See id.* ¶¶ 6, 8, 10, 41.) This Court thus has diversity jurisdiction over Plaintiff's claims and Defendant's Motion to Dismiss for lack of subject matter jurisdiction is denied. *See* 28 U.S.C. § 1332(a).

> **B.**      **Plaintiff's Motion for Summary Judgment**

>> *1.*      *Plaintiff's Standing*

Defendant first argues in opposition that discovery is necessary to determine whether Plaintiff validly holds the Note and Guaranty and has standing to bring this action because a mortgagee must establish its prima facie right to foreclose before doing so. (Def.'s Opp'n Br. 21-26.) Defendant contends that the Note is not indorsed to Plaintiff, so Plaintiff relies on a chain of allonges to determine its interest in the Note. (*Id.* at 23-24.) Defendant submits that there is no allegation or proof that the allonges were firmly affixed to the Note, so discovery is required to determine whether they were. (*Id.*) Second, Defendant asserts that "[t]here are serious doubts about the authenticity of [the] assignments" because the assignments annexed to the Sims Supplemental Declaration are different from the assignments relied upon by Plaintiff in its State Court Action. (*Id.* at 25.) Defendant maintains that discovery is required to determine the effect of the competing assignments and which, if any, are legitimate. (*Id.*) Third, Defendant argues that because Plaintiff lacks standing to enforce the Note, it lacks standing to enforce the Guaranty and

contends that Plaintiff does not allege an independent indorsement of the Guaranty and the assignments it relies on purport to transfer both the Note and Guaranty. (*Id.* at 25-26.)[8]

Plaintiff argues in reply that it has standing to sue on the Guaranty independent of the Note. (Pl.'s Reply. Br. 11-13.) It submits that the Guaranty is a collateral agreement, and it does not need to be a holder of the Note to sue on the Guaranty. (*Id.* at 11-12.) It maintains that the language of the Guaranty explicitly provides that Plaintiff may proceed against Defendant even if the Note was unenforceable. (*Id.* at 12.) Plaintiff also argues that there are no duplicative assignments but two different sets of assignments: (1) assignments that assigned the recorded mortgage and assignments of rents; and (2) assignments that were the catch all assignments that assigned the Loan Documents. (*Id.* at 13-14.) Plaintiff contends that even if there were duplicative assignments, there is nothing wrong with an assignor assigning the same loan documents in more than one set of assignments to the same assignee. (*Id.*) Plaintiff submits that any purported overlap does not raise a question as to the assignment's authenticity, so discovery is not needed. (*Id.* at 14.)

---

[8] Defendant's arguments in opposition all relate to Plaintiff's standing to bring the suit: affirmative defenses one and two. (*See generally* Def.'s Opp'n Br.; Def.'s Reply Br.) Defendant does not oppose or otherwise address Plaintiff's arguments in its motion for summary judgment seeking to strike Defendant's remaining affirmative defenses. (*See generally* Def.'s Opp'n Br.; Def.'s Reply Br.) The Court, accordingly, grants Plaintiff's request and strikes Defendant's affirmative defenses three through seventeen. *See, e.g.*, *Fairbairn v. Bd. of Educ. of S. Country Cent. Sch. Dist.*, 876 F. Supp. 432, 438 n.3 (E.D.N.Y. 1995) (granting plaintiff's motion for summary judgment to strike defendants' affirmative defenses because defendants failed to oppose the arguments); *Taha v. Bucks Cnty. Pa.*, 367 F. Supp. 3d 320, 325 (E.D. Pa. 2019) ("[T]he failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense." (internal quotation marks and citation omitted)); *Yanoski v. Silgan White Cap Ams., LLC*, 179 F. Supp 3d 413, 426 (M.D. Pa. 2016) ("It is well-established that a party's failure to argue an issue on summary judgment constitutes a waiver of that issue."); *Houston Cas. Co. v. Truist Fin. Corp.*, No. 18-1472, 2021 WL 3422357, at *2 (D. Del. Aug. 5, 2021) ("[A]n issue raised in the [answer] but ignored at summary judgment may be deemed waived." (alterations in original) (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995))).

Here, Defendant fails to raise any genuine disputes of material fact as to Plaintiff's standing to bring this suit. As discussed in more detail below, there is no genuine dispute as to the validity of the assignments. The majority of the arguments Defendant raises pertain to either foreclosing on a mortgage or whether Plaintiff properly acquired the underlying Note, not the Guaranty. (*See* Def.'s Opp'n Br. 21-26.) The cases cited by Defendant reflect the same. *See, e.g., Bank of N.Y. Mellon v. Walch*, No. 15-724, 2017 WL 1734031, at *1 (D.N.J. May 3, 2017) (noting that plaintiff "filed this foreclosure action" alleging defendants defaulted on their mortgage); *Adams v. Madison Realty & Dev., Inc.*, 853 F.2d 163, 164, 168 (3d Cir. 1988) (discussing whether promissory notes "containing indorsements on separate sheets of paper loosely inserted within each note" were valid); *Bank of N.Y. v. Raftogianis*, 13 A.3d 435, 437 (N.J. Super. Ct. Ch. Div. 2010) ("This opinion deals with the plaintiff's right to proceed with an action to foreclose a mortgage which secures a debt evidenced by a negotiable note."); *Wells Fargo Bank, N.A. v. Ford*, 15 A.3d 327, 327 (N.J. Super. App. Div. 2011) (deciding "the standing of an alleged assignee of a mortgage and negotiable note *to maintain a foreclosure action*" (emphasis added)); *Deutsche Bank Nat. Tr. Co. v. Mitchell*, 27 A.3d 1229, 1230 (N.J. Super. Ct. App. Div. 2011) (noting that the case was dealing with a "foreclosure action"). This case, however, is not a foreclosure action and does not rely on the underlying Note.

Defendant's argument that Plaintiff does not validly hold the Guaranty also fails to raise a genuine dispute of material fact for several reasons. *First*, the Guaranty is not governed by the UCC and is therefore not required to have the allonges affixed to it, because it is not a negotiable instrument. *See Wachovia Bank v. Credit Dr., Inc.*, No. A-5031-09T2, 2011 WL 3819802, at *8 (N.J. Super. Ct. App. Div. Aug. 31, 2011) (explaining that because the "guaranty agreements are separate and distinct from the promissory note . . . whe[n] the guarantor is not a party to the note[,]"

the guaranty agreements are not subject to Chapter 3 of the UCC). Here, Defendant was the Guarantor, and not a party to the underlying note. (*Compare* Guaranty (listing Defendant as the Guarantor); *with* Note (listing Whitehorse as the Borrower).) *Second*, during the Second Bankruptcy Case: (1) Goldwasser explicitly stated that the Loan Documents were assigned to Plaintiff; (2) the list of creditors holding the five largest secured claims listed Plaintiff as a creditor holding a $14,000,000 Mortgage; and (3) Defendant and Goldwasser stated under oath that the Schedules were accurate during the 341 Meeting. (Goldwasser Decl. ¶ 12; Ex. B to Goldwasser Decl.; 341 Meeting 6:14-7:19.) *Third*, the Guaranty expressly provides that Plaintiff may proceed against Defendant even if the Note is unenforceable:

> It is expressly understood and agreed that this is a continuing guaranty and that *the obligations of Guarantor* hereunder are and *shall be absolute* under any and all circumstances, *without regard to the validity, regularity[,] or enforceability of the Note*, the Loan Agreement, or the other Loan Documents, a true copy of each of said documents Guarantor hereby acknowledges having received and reviewed.

(Guaranty 1 (emphases added).) *Fourth*, a New Jersey state court entered a foreclosure judgment in favor of Plaintiff against Whitehorse on the mortgaged Property. (Ex. K to Sims Decl.) Thus, even if there is a dispute of fact about the alonges properly being affixed to the Note, due to the express terms of the Guaranty, and the evidence that the Loan Documents were assigned to Plaintiff, such a dispute about the alonges does not affect Plaintiff's standing to bring this action to enforce payment pursuant to the Guaranty. *Fifth*, there is no evidence and therefore no genuine dispute of material fact as to whether the assignments are valid. Defendant has confused the assignments assigning the Mortgage, leases, and rents with the broader assignments assigning the rest of the Loan Documents. (*Compare* Ex. J to Sims Decl. at Exs. I, K, M (assigning the Mortgage, leases, and rents); *with* Exs. A, B, C to Sims Supp. Decl. (assigning the Loan Documents).) The

separate assignments of the Mortgage, leases, and rents do not invalidate the assignments of the Loan Documents.[9] There is, accordingly, no genuine dispute of material fact as to the issue of the validity of Plaintiff's standing regarding the Guaranty and the Court therefore considers Plaintiff's claim on the merits below.[10]

### 2. The Guaranty

Plaintiff next argues that material facts needed to enter judgment against Defendant for damages pursuant to the Guaranty have been admitted to by Defendant. (Pl.'s Moving Br. 11.) Plaintiff contends that the facts show that Whitehorse admitted under oath that "it defaulted under the loan, that notice of default was given to it, a foreclosure judgment was entered, and a foreclosure sale was scheduled to be held just days after the Second Bankruptcy Case was commenced." (*Id.*) Plaintiff, moreover, avers that there is no genuine dispute about Defendant's liability under the Guaranty because "under the plain language of the Loan Agreement and Guaranty, the recourse provisions of the Guaranty have been triggered and Defendant is liable for

---

[9] The assignments of the Mortgage, leases, and rents were attached to the pleadings in the State Court Action because they were pertinent to the foreclosure at issue. The assignments of the Loan Documents were attached here because Defendant's liability under the Guaranty is what is at issue.

[10] While true that "a court is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery[,]" it "is not precluded from granting summary judgment if the party opposing summary judgment does not have an availing affirmative defense." *Selective Ins. Co. of Am. v. Christeyns Laundry Tech., LLC*, No. 19-11723, 2020 WL 6194015, at *4 (D.N.J. Oct. 22, 2020) (internal quotations omitted) (quoting *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007)). Defendant, moreover, bears the burden of proving affirmative defenses. *Patch of Land Lending, LLC v. 181 Mapes Ave, LLC*, No. 16-9540, 2017 WL 6550483, at *3 (D.N.J. Dec. 21, 2017). Defendant fails to meet that burden here, and as discussed above, there are no genuine disputes of material fact relating to Defendant's affirmative defenses one and two (that Plaintiff does not have standing). The Court, accordingly, strikes them. While Defendant submitted a Rule 56(d) declaration, (*see generally* Ross Decl., ECF No. 38-2), such discovery is not needed because the underlying documents are not in dispute.

the total indebtedness due and owing under the loan." (*Id.* at 12.) Plaintiff argues it is entitled to summary judgment because "irrefutable evidence establishes that[:]" (1) Defendant executed and is the signatory of the Guaranty; (2) under the terms of the Guaranty, Defendant guaranteed payment and performance of all Guaranteed Obligations defined therein; (3) the Original Lender relied upon the Guaranty and Defendant's representations and warranties therein, in lending monies to Whitehorse as reflected by Whitehorse expressly stating so; (4) Whitehorse defaulted on the terms of the Loan Documents, failed to cure its defaults, and is still in default; (5) Plaintiff delivered written demand for payment; and (6) Defendant defaulted on the terms of the Guaranty, failed to cure, and is still in default. (*Id.* at 13.)

The Guaranty at issue is governed by New Jersey law. (Guaranty 5 (explaining that the Guaranty "shall be governed . . . in accordance with the laws of the State where the Property is located")." "Under New Jersey law, 'in order to prove liability on a guaranty, a plaintiff must demonstrate: (1) execution of the guarantee by the guarantor; (2) the principal obligation and terms of the guaranty; (3) lender's reliance on the guaranty; (4) default by principal obligator; (5) written demand for payment on the guarantee; and (6) failure of the guarantor to pay upon written demand.'" *Ramada Worldwide Inc. v. PRMC, Inc.*, No. 15-3841, 2017 WL 3671161, at *4 (D.N.J. Aug. 25, 2017) (quoting *Knights Franchise Sys., Inc. v. First Value RC, LLC*, No. 13-4976, 2017 WL 1170849, at *3 (D.N.J. Mar. 29, 2017)).

As to the first element, Defendant executed the Guaranty as evidenced by his signature on the document. (Guaranty 7.) As to the second element, the terms of the Guaranty are unambiguous and clearly set forth Defendant's obligation that he "absolutely and unconditionally guarantees . . . the prompt and unconditional payment of the Guaranteed Recourse Obligations of Borrower." (Guaranty 1.) Moreover, the Guaranty provides that "the obligations of Guarantor

hereunder are and shall be absolute under any and all circumstances, without regard to the validity, regularity or enforceability of the Note, the Loan Agreement, or the other Loan Documents[.]" (*Id.*) The Guaranty further provides that the "Lender shall be deemed to include its successors and assigns," (*id.* at 4) and that the "Lender may sell, transfer[,] and deliver the Note and assign the Loan Agreement, the Security Instrument, this Guaranty and the other Loan Documents to one or more Investors in the secondary mortgage market" (*id.* at 5). As to the third element, the express terms of the Guaranty provide "FOR VALUE RECEIVED, and to induce [Original Lender], to lend to [Whitehorse], . . . [Defendant] hereby absolutely and unconditionally guarantees to Lender the prompt and unconditional payment of the Guaranteed Recourse Obligations of Borrower." (*Id.* at 1); *see also Ramada Worldwide*, 2017 WL 3671161, at *4 (finding that the plaintiff had established the third element because the guaranty expressly stated that "its purpose [was] to induce [the plaintiff] . . . to sign [a] Franchise Agreement with" the defendant (quotations omitted)).

As to the fourth element, Defendant contends that Plaintiff's statement that Whitehorse is in default is a conclusion of law. (DSOF ¶ 19.) Plaintiff, however, submits ample evidence to show that Whitehorse is in default. *First*, Plaintiff submits a declaration by Sims explaining Borrower's default. (Sims Decl. ¶¶ 24-34.) *Second*, Plaintiff submits both a State Court Judgment and Writ of Execution it obtained against Whitehorse in a Foreclosure Action in New Jersey State Court. (Ex. K to Sims Decl.; Ex. L to Sims Decl.; *see also* Goldwasser Decl. ¶ 13 (noting that in "July 2023, [Plaintiff] commenced a mortgage foreclosure action" and "[a]fter some litigation, the New Jersey state court granted a judgment of foreclosure").) The Court notes that Defendant does not contest the authenticity of the state court judgment in his briefing. *Third*, Plaintiff submits the Goldwasser Declaration submitted on behalf of Whitehorse during the Second Bankruptcy Case in which

Goldwasser declared that "[Whitehorse] defaulted on the LSTAR Loan which had been assigned to [Plaintiff], as a trustee of the [Trust.]" (Goldwasser Decl. ¶ 12.) *Fourth*, attached to the Goldwasser Declaration is the list of Whitehorse's five largest secured creditors which lists only Plaintiff as holding a $14,000,000 claim pursuant to a mortgage. (Ex. B to Goldwasser Decl.) While Defendant has submitted a new Schedule D to the Bankruptcy Court listing Plaintiff's claim as disputed, there is no genuine dispute of material fact based on the evidence described above. The Court also notes that the new Schedule D was submitted after the pendency of this action.

As to the fifth element, Plaintiff submits three notices of default which satisfy the written notice required. (Ex. G to Sims Decl.; Ex. H to Sims Decl.; Ex. I to Sims Decl.) Plaintiff further submits the Goldwasser Declaration which provides that "[b]y letter dated May 19, 2023, [Plaintiff] advised [Whitehorse] based upon prior and continuing defaults, the LSTAR Loan was accelerated." (Goldwasser Decl. ¶ 13.)

As to the sixth element, the evidence cited above pertaining to the fourth and fifth elements also shows that the outstanding balance has not been paid. (Sims Decl. ¶¶ 24-34; Ex. K to Sims Decl.; Ex. L to Sims Decl.; Ex. G to Sims Decl.; Ex. H to Sims Decl.; Ex. I to Sims Decl.' Ex. B to Goldwasser Decl.) The evidence, accordingly, satisfies all six elements of Plaintiff's guaranty claim and would not support a jury verdict in favor of Defendant. Plaintiff's Motion for Summary Judgment is therefore granted.

## IV.  **<u>CONCLUSION</u>**

For the reasons set forth herein, Defendant's Motion to Dismiss is denied. Plaintiff's Motion for Summary Judgment is granted. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

DATED: NOVEMBER 21st, 2025